**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JOHN S. HENRY,

       Plaintiff,

v.                              CASE NO. 3:08-cv-00862

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

       Defendant.

**M E M O R A N D U M  O P I N I O N**

       This is an action seeking review of the decision of the Commissioner of the Social

Security Administration ("SSA") denying Claimant's application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  The

matter is before the Court on the cross motions of the parties seeking Judgment on the

Pleadings. (Docket Nos. 13 and 14)  Both parties have consented in writing to a decision

by the United States Magistrate Judge. (Docket Nos. 9 and 10).

I.    **Procedural History**

       Plaintiff, John S. Henry (hereinafter referred to as "Claimant"), filed an

application for DIB on July 13, 2001, alleging disability as of October 20, 1991 due to the

following conditions: lack of education, diabetes, back injuries, strokes, hearing loss,

and memory loss.  (Tr. at 56-58, 62-70).  Claimant met the nondisability requirements

for DIB and was insured for benefits through March 31, 1995.  (Tr. at 18, 266) The claim

was denied initially and upon reconsideration.  (Tr. at 35-39, 41-43).  The Claimant

requested a hearing before an Administrative Law Judge.  (Tr. at 44). The hearing was held on April 23, 2002, before the Honorable Charlie P. Andrus (hereinafter referred to as the "ALJ").  (Tr. at 224-249).  A supplemental hearing was held on October 24, 2002. (Tr. at 216-223). By decision dated January 24, 2003, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 10-19). The ALJ's decision became the final decision of the Commissioner on June 5, 2003 when the Appeals Council denied Claimant's request for review.  (Tr. at 4-6).  On August 1, 2003, Claimant brought a civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Tr. at 282-283).

On March 8, 2005, the Honorable Robert J. Staker, Senior United States District Judge, reversed the Commissioner's decision and remanded the matter to the ALJ to further develop the record. (Tr. at 288-295). The Court found that the parties disagreed on whether the Claimant's impairments and educational abilities prevented him from working, but the Court was unable to make a "reasoned review" of the Commissioner's decision given contradictory evidence and a lack of explanation by the ALJ for his conclusions on that issue. (Tr. at 293-294).   On remand, the ALJ was specifically charged with developing the record on the issue of Claimant's level of literacy and education.   Furthermore, the ALJ was instructed to explain the factual basis for his conclusions regarding this issue.

Subsequent to the remand, Claimant underwent an adult mental profile assessment by Brian P. Bailey of Accord Psychological Services, Inc.[1]    In addition, the ALJ held a third hearing on July 27, 2006, which was focused on ascertaining

---

[1]  On February 7, 2006,  Mr. Bailey evaluated Claimant's current intellectual and psychosocial functioning, as well as his mental and psychological status. (Tr. at 305-309).

2

Claimant's level of literacy and education as of March 31, 1995, the last day he was insured for benefits. (Tr. at 271-278). By decision dated October 4, 2006, the ALJ again determined that Claimant was not entitled to benefits, because the Commissioner had established by substantial evidence that alternative jobs existed in significant numbers in the regional and national economy in which Claimant could engage despite the impairments he demonstrated as of March 31, 1995. (Tr. at 260-267). The ALJ's decision became the final decision of the Commissioner on April 22, 2008 when the Appeals Council denied Claimant's request for review. (Tr. at 250-252). On June 23, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a), 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If a severe

3

impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id.* §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.   *Id.* §§ 404.1520(e), 416.920(e).

By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, after considering the additional question posed on remand, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 262).  Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of chronic low back pathology and coronary artery disease. *Id.* At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of

any listing in Appendix 1.  *Id.*  The ALJ then found that Claimant had a residual functional capacity (hereinafter referred to as "RFC") for light work, reduced by exertional and nonexertional limitations.  (Tr. at 264).  As a result, Claimant could not return to his past relevant work as a truck driver, which was considered to fall within the category of heavy work.  (Tr. at 265).  Nevertheless, the ALJ concluded that Claimant could perform jobs such as machine tender, inspector, packer, grader/sorter, and marker, all of which exist in significant numbers in the national and regional economy.  (Tr. at 265-266).  On this basis, the ALJ denied benefits.  (Tr. at 267).

## II.   <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's applications for benefits is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, *Id*.  However, the Court must not abdicate its "traditional function" or "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

Although this case was somewhat complicated by the passage of time, a careful review of the record reveals that the Decision of the Commissioner is supported by substantial evidence.

## III.   **Claimant's Background**

Claimant was fifty-three years old on March 31, 1995. (Tr. at 261). He had discontinued formal education during the seventh grade (Id.), but could speak, read, and write English. (Tr. at 61-70). In the past, he worked as a truck driver and mechanic. (Id.).

## IV.   **The Medical Record**

The Court reviewed all evidence of record, including the medical evidence of record, and discusses it in detail below. As Claimant was insured for benefits through March 31, 1995, he was required to establish that he was disabled within the meaning of the Social Security Act on or prior to that date in order to obtain benefits. (Tr. at 261). Claimant offered evidence in the form of medical records that both pre-dated and post-dated March 31, 1995. Because evidence of impairments that developed after March 31, 1995 is not relevant to establish disability for the purpose of the claimed benefits, the subsequent medical information is evaluated only to the extent that it establishes or refutes Claimant's disability on or prior to that date.

6

**Pre-March 1995 Records**

On April 1, 1980, Claimant presented to St. Mary's Medical Center's Emergency Department complaining of epigastric and left shoulder pain. (Tr. at 197-198). Claimant told the Emergency Department physician that he had experienced symptoms of peptic ulcer disease since 1973 and, while at work the previous evening, he suffered a severe and sudden onset of epigastric, left chest, and left shoulder pain. (Tr. at 197). He was assessed in the Emergency Department and was then admitted to the hospital for a more thorough medical work-up. (Id.).  During this admission, Claimant was evaluated by an orthopedic consult, Dr. Colin M. Craythorne, who considered that Claimant might have a cervical disc protrusion causing his symptoms. (Tr. at 183). Upon discharge, Claimant was instructed to follow-up with Dr. Craythorne and told to return to the hospital if his abdominal pain recurred. (Id.). Claimant's pain subsided during his hospital stay and his condition at the time of discharge was good. (Id.).

On April 30, 1980, Claimant was referred by Dr. Craythorne to Hossein Sakhai, M.D., a neurosurgeon, for evaluation. (Tr. at 179-182). Claimant told Dr. Sakhai that he had no pain, but experienced some weakness of his left side when he worked, and he reported having passed out on four occasions since his discharge from St. Mary's. (Tr. at 179). Dr. Sakhai ordered physical therapy and a neurological consultation. (Id.).   On June 16, 1980, Dr. Sahkai re-examined Claimant, noting that Claimant had regained his strength and was able to work around his house with no particular difficulty. (Tr. at 176). Claimant's skull and cervical spine x-rays, computed tomography ("CT") scan, and electroencephalogram were all within normal limits. (Id.). Dr. Sakhai reported to Dr.

Craythorne, "[w]ith these negative findings, I did not feel that any specific neurological intervention was indicated at this time." (Id.).

In mid February 1983, Claimant was hospitalized at St. Mary's Medical Center for chest pain and was examined by Dr. Frank Rivas, a cardiologist. (Tr. at 116-126). Claimant advised Dr. Rivas that he had a history of peptic ulcer disease, but had been asymptomatic until a few months before the hospitalization.  He indicated that he had suffered a stroke a few years earlier that had left him with some left hemiparesis, but this was not limiting his activities. (Tr. at 121). Dr. Rivas ordered a chest x-ray, which revealed that Claimant's heart and lungs were within normal limits, (Tr. at 124), and upper gastrointestinal and cervical spine studies were also normal. (Tr. at 120).

On February 15, 1983, Dr. Rivas performed a cardiac catheterization on Claimant to rule out coronary artery disease as a cause of his chest pain. (Tr. at 117). The catheterization revealed normal coronary arteries, an ejection fraction of 79%, and no evidence of significant valvular disease.  In the Final Discharge Summary dictated on February 16, 1983, Dr. Rivas diagnosed Claimant with the following conditions:

1.  Unstable angina like chest pain, noncardiac in origin.

2.  Status post stroke with residual left hemiparesis.

3.  Essential hypertension by history.

(Tr. at 116).

On April 23, 1989, Claimant returned to St. Mary's Medical Center's Emergency Department complaining of pain in his lower back.  He reported that he had lifted a trash container at work, which weighed around 120 pounds, and experienced a dull ache in his lumbar spine with sharp pains that were positional. (Tr. at 113-115). He was

diagnosed with lumbosacral sprain and referred to an orthopedist for follow-up. (Tr. at 113). Claimant returned to Dr. Craythorne for this care.

On April 28, 1989, Dr. Craythorne reported to the worker's compensation fund that he had examined Claimant on April 26, 1989 and determined that Claimant suffered from a strain to his lower back and possibly an underlying disc protrusion, which were related to Claimant lifting barrels of sand, gravel and cement at work. (Tr. at 99-100). Dr. Craythorne began Claimant on a course of physical therapy and medications and advised him to remain off work. (Id.). Dr. Craythorne continued to treat Claimant for the back injury until July 12, 1989 when Dr. Craythorne discharged Claimant from active treatment.  (Tr. at 91-101).  In correspondence to the workers compensation fund dated August 4, 1989, Dr. Craythorne reported that Claimant was "much improved" with a 60% range of motion of the low back.  He indicated that Claimant was neurologically intact and could return to work.  Dr. Craythorne felt that Claimant would "probably have a mild permanent impairment to his lower back." (Tr. at 91).

On July 18, 1990, Dr. Craythorne documented a new office visit with Claimant. Dr. Craythorne noted that Claimant was "called back to work" after he was discharged from medical care approximately one year earlier; however, Claimant "felt that he couldn't work" and had not returned. (Tr. at 90). According to Dr. Craythorne, Claimant "tells me his back is no worse but he has difficulty controlling his legs and his legs seem to go to sleep alot."  Dr. Craythorne confirmed that there had been "no new injury." (Id.).  A CT scan of the back was "okay." (Id.)  On examination, Dr. Craythorne found Claimant's lower back range of motion to be 20 degrees of extension, 20 degrees of

lateral flexion, 20 degrees of lateral rotation, and 70 degrees of forward flexion. (Id.). Claimant's straight leg raising test was negative. (Id). Dr. Craythorne commented that Claimant had recently been evaluated by an independent medical expert retained by workers compensation and was awaiting that report. (Id.).   Thereafter, Claimant apparently returned to work, where he drove a truck, hauling concrete ten hours per day, six days per week. (Tr. at 63).

### Post-March 1995 Records

Claimant's medical records resume on or about April 19, 2000.  On this date, Claimant was evaluated by Dr. Gilbert A. Garza, M.D. for fatigue, an increased need to urinate at night, shortness of breath and blurred vision.  Claimant advised Dr. Garza that he had not seen a physician in two years and had quit taking his diabetes medication due to cost. (Tr. at 167-169). Dr. Garza's impression was that Claimant suffered from uncontrolled diabetes mellitus, dyspnea (shortness of breath) on exertion, orthopnea (shortness of breath while lying flat), paroxymsmal nocturnal dyspnea (respiratory distress that awakens one from sleep), difficulty with sleep, and restless legs. (Tr. at 168).

On April 20, 2000, Dr. Garza followed up with Claimant after reviewing his laboratory results. (Tr. at 166). Dr. Garza's impression was "diabetes mellitus, under poor control" and osteoarthritis. (Id.). He provided Claimant with a diet program and referred him to the Joslin Clinic for diabetic counseling. (Id.).  Four days later, Dr. Garza again evaluated Claimant's laboratory tests and assessed Claimant's conditions as poorly-controlled diabetes mellitus, hyperlipidemia, and non-bleeding peptic ulcer disease. (Tr. at 156).  On May 15, 2001, Dr. Garza noted the results of Claimant's

10

Cardiolite stress test as being  "consistent with ischemia at the septum and ischemia of the inferior wall" and that "[g]ating showed a resting left ventricular ejection fraction of 51%" with "normal regional wall motion [and thickening]." (Tr. at 149). Dr. Garza corroborated his earlier assessments, adding that Claimant's diabetes mellitus was "type 2." (Id.).

On July 13, 2001, Claimant applied for disability benefits, completing a Disability Report.  In that report, he stated that he could speak and read English and write more than his name in English. (Tr. at 61). He listed the illnesses that prevented him from working as lack of education, diabetes, back injuries, strokes, hearing loss, and memory loss. (Tr. at 62). Claimant noted that his "main skill [was] truck driving," that he "got dizzy [and could not] see well or lift because of [his] back," and that he did not have "enough education to do a desk job." (Id.). His illnesses, which first became apparent on March 31, 1980, caused him pain and rendered him unable to work as of October 20, 1991. (Id.). His symptoms caused him to miss work and he was unable to work in the winter due to joint pain. (Id.) Claimant indicated that he stopped working because he injured his back in 1989 and eventually, he could not drive for long periods of time or lift anything heavy. (Id.). His diabetes made him dizzy and he could not "read well enough to do desk work." (Id.). In his past employment, Claimant had not used any technical knowledge or skills and did not write or complete reports. (Id.). Claimant confirmed that he had been evaluated for his physical symptoms, but denied any emotional or mental assessments. (Tr. at 64). The highest grade that Claimant completed was seventh grade, and he did not complete any subsequent vocational training. (Tr. at 68).

The same day as Claimant completed his Disability Report, T. Fuller, of the Social Security Administration Field Office, interviewed Claimant in person. (Tr. at 71-74). Claimant's alleged onset date was October 20, 1991 and last insured date was March 31, 1995. (Tr. at 71). Mr. Fuller noted that Claimant had filed an application for benefits in the past, which was denied on May 27, 1983. *Id.* Mr. Fuller observed that Claimant had difficulty hearing, reading, standing, and walking. (Tr. at 73). Mr. Fuller had to repeat questions to Claimant, and his wife read the forms to him and answered many of the questions. (Id.). However, Claimant did not have difficulty breathing, understanding, being coherent, concentrating, talking, answering, sitting, seeing, using his hands, or writing. (Id.).

On July 24, 2001, Dr. Garza performed a diagnostic left heart catheterization, coronary arteriography, and left ventriculography on Claimant at St. Mary's Regional Heart Center. (Tr. at 140-142). Claimant was advised that he had a "50% stenosis on the proximal right coronary artery," which was significant, but not severe. (Tr. at 141). He was advised that he must strictly control risk factors by losing weight; consuming less than 20 grams of fat per day; abstaining from sugar, tobacco, and alcohol; and controlling his triglycerides. (Tr. at 141).

On August 6, 2002, Robert Marshall, M.D., an independent expert for the SSA, completed a set of interrogatories prepared by the ALJ. (Tr. at 203-209). Based on his review of Claimant's medical evidence and his professional knowledge, Dr. Marshall felt that Claimant suffered from "low back ache and chest pain," although his impairments did not separately or in combination meet or equal any impairment described in the Listing of Impairments. (Tr. at 204).  Dr. Marshall opined that Claimant suffered from

the following limitations on or before March 31, 1995: (1) Claimant was unable to work "at heights" or around open, dangerous machinery; (2) Claimant was unable to "work in excessive noise;" (3) Claimant was "limited to more simple routing work;" and (4) Claimant required "the option to sit/stand at one hour intervals." (Tr. at 206). Dr. Marshall did not find that the medical evidence established any other limitations. (Tr. at 207).

On September 19, 2001, Thomas Lauderman, D.O., completed a RFC Assessment of Claimant's physical abilities. (Tr. at 102-109). Dr. Lauderman found that Claimant had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 103-107). Dr. Lauderman did not base his conclusions on any statements from a treating or examining source regarding Claimant's physical capacities because there were none in the file. (Tr. at 108).

On October 16, 2001, Claimant completed a Reconsideration Disability Report. (Tr. at 75-78). He stated that since he filed his claim, the changes to his condition included the following: a heart catheterization that showed blockage, he was told that he "must watch [his] physical activities," he was "short of breath," and he had "chest pains." (Tr. at 75). His updated limitations were that he "must watch [his] physical exertion" and had a tendency to fall asleep without notice." *Id.* He was told by Dr. Rivas that he must "limit physical exertion" and that if he felt chest pain or shortness of breath, he must sit down. (Id.). He had not worked since filing his claim. (Tr. at 77). He also stated that he had to spend more time lying down, that his sugar level fluctuated causing difficulty with his vision, and his arthritis prevented him from walking. (Tr. at 77).

On April 12, 2002, Claimant's wife signed a sworn affidavit stating that since her marriage to Claimant in May 1961, she filled out his employment applications, correspondence, and social security forms, and also managed the finances and wrote all checks. (Tr. at 83). She further stated that she attempted to read the information from his GED class to him, but he was unable to finish it, and she also accompanied him to the doctor because she did not believe he understood what the doctor told him. (Id.).

On the same day, Claimant signed a sworn affidavit stating that he left his most recent employment position due to "back problems" and "black out spells." (Tr. at 81). He took his driver's license test orally because he "had problems with reading comprehension." (Id.). He "had always had trouble reading" and "could not finish" the GED class which his wife attempted to read to him. (Id.). He dropped out of high school when he "turned 16." (Id.). He never filled out a job application or wrote a check. (Id.). The dispatcher filled out the log sheets for him when he was working and he required oral instructions to drive anywhere, which is why he drove locally, rather than "long haul." (Id.). When he and his wife moved into a new home, he spent three hours trying to find it after work. (Id.). He used landmarks to remember where places were located and dreaded finding his way home after work. (Id.).

On August 6, 2002, Dr. Marshall answered a second set of interrogatories concerning Claimant. (Tr. at 203-206).  Once again, Dr. Marshall noted that Claimant had low back pain, which likely caused him discomfort and required him to shift positions from time to time.  Dr. Marshall opined that the impairments suffered by Claimant prior to March 31, 1995 included only a mild disc disease of the L-5/S-1 that

was "probably enough to restrict him to work at the light level," but did not entirely prevent him from engaging in substantial gainful activity.   (Tr. at 204-207).

On February 7, 2006, Brian P. Bailey, M.A., performed a psychological assessment of Claimant. (Tr. at 305-309). He found that Claimant's verbal IQ was 66, his performance IQ was 65, and his full scale IQ was 63. (Tr. at 307). Claimant had "minor difficulties in comprehending and complying with directions," and "put forth a valid effort," which was suspected to be "diminished as a result of cognitive impairment." (Id.). Mr. Bailey found that the results were "inconsistent with [Claimant's] reported academic and vocation history" and that overall, "results of his intelligence test [were] invalid because of internal and external factors." (Id.). The diagnostic rationale states: Claimant "was diagnosed with vascular dementia, with depression, based on his history of two cerebrovascular accidents and related memory impairments." (Tr. at 308). Further, he "exhibited a degree of aphasia and apraxia related to his cerebrovascular accidents." (Tr. at 308-309).

Mr. Bailey also conducted a Medical Assessment of Ability to do Work-Related Activities (Mental). ((Tr. at 310-312). Mr. Bailey found that Claimant had a "poor" ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, and function independently. (Tr. at 310). He found that Claimant had no ability to follow work rules, use judgment, or maintain attention/concentration. (Id.). The limitations Mr. Bailey cited to support his assessment were "vascular dementia, resulting from impaired memory, judgment, abstract thinking and executive functioning." (Id.). Mr. Bailey found that Claimant had poor or no ability to make performance adjustments due to the same limitations. (Tr. at 311). Mr. Bailey found that

Claimant had a fair ability to maintain personal appearance, but a poor ability to relate predictably in social situations and demonstrate reliability, stating that he was forgetful and suffered from emotionally instability, resulting in significant social alienation. (Id.).

## V.     Claimant's Challenges to the Commissioner's Decision

Claimant asserts that "the decision of the ALJ that Claimant had a limited education is not supported by substantial evidence and any finding dependent upon this determination is error." (Pl.'s Br. at 8). Claimant contends that his limitations, as noted by the Social Security Field Office, his wife, and his sworn statements, are consistent with the SSA's definition of illiteracy, rather than consistent with a finding of limited educational ability. (Pl.'s Br. at 7-8). Consequently, in light of Claimant's alleged illiteracy, closely approaching advanced age,[2] and RFC for light work, Claimant argues that the ALJ should have determined that Claimant was disabled under Grid Rule 202.09.[3] *Id.*

Conversely, the Commissioner argues that the ALJ provided substantial evidence from the record, including direct evidence from Claimant and Claimant's wife, which contradicted Claimant's contention that he was illiterate. (Def.'s Br. at 1-2, 7-10). Therefore, the Commissioner argues, Claimant is not disabled pursuant to Grid Rule 202.10.[4] (Def.'s Br. at 9).

---

[2] The term "closely approaching advanced age" refers to individuals aged 50-54 years old. 20 C.F.R. 404.1563(d) (2006). An individual 55 years old or older is considered "of advanced age." 20 C.F.R. 404.1563(e) (2006). Claimant was 53 years old on the date that he was last insured; thus, he is considered "closely approaching advanced age" for disability determination purposes.

[3] *See* 20 C.F.R., Part 404, Subpt. P, App. 2, Rule 202.09. (2006).

[4] *See* 20 C.F.R., Part 404, Subpt. P, App. 2, Rule 202.10. (2006).

# VI.    **Discussion**

Claimant's sole assertion of error concerns his alleged illiteracy. The determination of illiteracy is particularly crucial in this case because if Claimant is found to be illiterate, he is automatically deemed disabled under 20 C.F.R., Part 404, Subpt. P, App. 2, Rule 202.09 (2006) (hereinafter referred to as "Grid Rule 202.09"). Grid Rule 202.09, in relevant part, provides that an individual is disabled under the Regulations if he is (1) closely approaching advanced age, (2) illiterate, and (3) has unskilled previous work experience. *Id.* This can be compared to the following provision, Grid Rule 202.10, which states that an individual with the same limitations, except who has a "limited or less" level of education and is "at least literate" is not disabled.

Neither party challenges the findings that Claimant was "closely approaching advanced age" when he was last insured for disability benefits and that his previous work experience is defined as unskilled. *See* (Pl.'s Br. at 1-8) and (Def.'s Br. at 1-11). Therefore, the Court only considers whether the Commissioner's decision that Claimant's literacy/educational level in March 1995 was "marginal" is supported by substantial evidence.[5]

The Regulations apply the following categories, in relevant part, to evaluate a Claimant's educational level:

> (1) Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

---

[5]  Claimant's assertion that it was "the decision of the ALJ that the claimant had a limited education" is inaccurate. (Pl.'s Br. at 8). The ALJ unmistakably states on the second and eighth pages of his Decision that it is his finding that Claimant has a "marginal education" level. (Tr. at 2, 8). There is no explanation for Claimant's assertion, as a finding of "limited education" does not appear anywhere in the Decision.

(2) Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

(3) Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 CFR 404.1564(b)(1)-(b)(3) (2006).

In making the determination that Claimant had a marginal educational level, and thus was literate, the ALJ clearly afforded Claimant the benefit of the doubt that his abilities in 1995 were less than suggested by his educational history. The ALJ was also mindful of the Regulations, which advise Claimants, "the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower." 20 CFR 404.1564(b) (2006). The ALJ stated that although Claimant attended school until seventh grade, a "further review of the evidence shows that [he] has the ability to read only at the first grade level and perform math at the fourth grade level." (Tr. at 261). Based on these findings, the ALJ concluded that Claimant had a marginal educational level. *Id.* As discussed below, the ALJ's determination of Claimant's educational level was consistent with the evidence of record and supported by specific findings of fact.

The ALJ considered the consultative psychological examination conducted by Mr. Brian Bailey subsequent to the remand of Claimant's initial civil case. (Tr. at 262-263). By the time of this examination, which was eleven years after his last insured date, Claimant had obvious hearing and cognitive deficits, which interfered with his ability to

18

be tested. However, as the goal of the testing was not to confirm Claimant's present condition, but was to discern his level of literacy/education as it existed on and before March 31, 1995, Claimant's limited ability to participate in the testing only frustrated that purpose. Nonetheless, Mr. Bailey's consultation did shed some light on the crucial issue in two respects. First, Claimant's wife told the consultant that Claimant "was able to read and write" and had been able to complete travel logs during the time that he drove a truck.  (Tr. at 307). Second, Claimant was noted to have an "exemplary work record" and good employee relations in his prior occupations as truck driver, mechanic, and auto worker, both of which are inconsistent with an employee who is functionally illiterate and struggles to comprehend his duties. (Id.).

Inasmuch as the results of the WRAT-3 intellectual assessment demonstrated that Claimant's intellectual abilities were lower than his educational history suggested, Mr. Bailey questioned the validity of the results. (Tr. at 307, 308).  The test rated Claimant's reading and spelling abilities at the first grade level and his mathematical ability at the fourth grade level. (Tr. at 307). Yet, in assessing the validity of the test, Mr. Bailey noted that Claimant's "performance was affected by the same factors" relevant to the IQ test, the results of which Mr. Bailey found "invalid because of internal and external factors." *Id.* Mr. Bailey noted that Claimant's performance and results on the WRAT-3 test may "underestimate his levels of academic achievement." (Tr. at 308). Despite Mr. Bailey's voiced reservations, the ALJ chose to accept the test findings to give Claimant the benefit of the doubt and incorporated them into his Decision.

The ALJ specifically took notice of Mr. Bailey's Medical Assessment of Ability to do Work-Related Activities (Mental), although that assessment was not particularly

germane to the issue of literacy.  The ALJ posed a hypothetical question to the vocational expert based upon the findings contained in the Assessment, and the vocational expert opined that an individual with the level of cognitive and mental impairments described in the Assessment would not be employable even in a light duty job category.  (Tr. at 277). However, in his decision, the ALJ expressly discounted the applicability of the Mental Assessment to the insured period and found that the "hypothetical factors" offered from the Assessment were "considered to be a material exaggeration of the substantial evidence of record" pertinent to Claimant's condition as of March 31, 1995. (Tr. at 263). The ALJ acknowledged that "an individual with [the limitations noted in the Assessment] would not be able to perform work in the region or national economy." *Id.* However, the ALJ further stated:

> Unfortunately, these limitations are based on a current view of the claimant's level of functioning and there is simply not sufficient evidence of record to support a finding that the claimant was so limited during the relevant time frame which is necessary to find the claimant disabled on or before his date last insured.

*Id.*  Pointing to evidence that existed during the relevant time frame, the ALJ noted that Claimant resumed work following his strokes and did not discontinue working until 1991. (Tr. at 263).  Presumably, Claimant's cognitive deficits, as reflected on the 2006 Assessment, would have prevented his return to work if they had existed in 1991.  As the ALJ emphasized, Claimant simply did not produce evidence that he suffered from this level of cognitive impairment as of March 31, 1995.

The ALJ then considered Claimant's testimony and the sworn affidavits from Claimant and his wife. (Tr. at 264). In assessing Claimant's credibility, the ALJ noted that Claimant "tended to exaggerate his limitations," "focused his attention on his

present symptoms," and "was vague about his level of functioning prior to the date last insured." (Tr. at 264).   The ALJ stated, "I do not consider the claimant to be entirely credible in his testimony, the extent of his subjective protestations remaining unsupported by clinical proof and other relevant evidence." (Tr. at 266). This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1983). The Court of Appeals for the Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). No such exceptional circumstances are present here; thus the ALJ's observations must be accepted and afforded substantial weight.

Reconciling Claimant's testimony and all other evidence of record, it appears that Claimant does not possess a high degree of reading comprehension or writing ability. However, it is also evident that he does not meet the definition of "illiterate" as defined in 20 CFR 404.1564(b)(1) (2006). Claimant offers no evidence that he "cannot read or write a simple message such as instructions or inventory lists." 20 CFR 404.1564(b)(1) (2006). Instead, Claimant offers evidence indicating only that he has *difficulty* reading and with reading comprehension: He could not "read well enough to do desk work" (Tr. at 62); T. Fuller observed that he had "difficulty reading" (Tr. at 73); he "had always had trouble reading" (Tr. at 81); he took his driver's test orally because he "had problems with reading comprehension" (Tr. at 81). But when specifically asked on the Social Security Administration Disability Report if he could read and write English, Claimant checked the boxes marked "yes" confirming he could "read English" and "write more

than [his] name in English." (Tr. at 61).  Under these facts, Claimant does not establish that he was illiterate within the meaning of the Regulations.

In the absence of convincing evidence that he was illiterate as of March 31, 1995, Claimant is not presumptively disabled.  The SSA has advised that basic communication is all that is necessary to perform unskilled light work. *Hicks v. Astrue*, 2009 U.S. Dist. LEXIS 129123, *36 (D. Va. 2009). *See* 20 C.F.R. Part 404, Subpt. P, App., Rule 202.00(g) (2006). Indeed, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting." *Id.* (quoting SSR 85-15, 1985 SSR LEXIS 20).

It is noteworthy that during the administrative hearing, the ALJ asked the vocational expert if an individual with the following limitations and under the following conditions could perform any jobs in the regional or national economy:

(1) must have the option to sit or stand at one-hour intervals

(2) cannot work at heights or around open, dangerous machinery

(3) cannot work in excessive noise

(4) limited to more simple, routine work

(5) limited to light work (lifting nor more than 20 pounds occasionally and 10 pounds frequently)

(6) 53 years old at the end of his insured status

(7) has a first grade reading level and a fourth grade arithmetic level

(Tr. at 275-276). The vocational expert responded that such an individual could work as a machine tender, inspector, packer, grader/sorter, and marker, all of which exist in significant numbers in the regional and national economy. (Tr. at 276). The ALJ then inquired whether a person with all of the above limitations, except who is illiterate in the English language, could perform the jobs that she listed. The expert answered in the affirmative. (Tr. at 277).   Accordingly, the vocational expert confirmed that the type of jobs identified for Claimant were jobs which could be performed by an individual with marginal education.   This testimony by the vocational expert provided substantial evidence upon which the ALJ reasonably concluded that the Commissioner had met his burden of proof that alternative jobs existed in the national and regional economy in which Claimant could engage.

## VII.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence.   Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** October 5, 2010.

_____
Cheryl A.  Eifert
United States Magistrate Judge

23